# SUCCESSION OF GUILLEMIN.

The term *absentee* embraces persons residing abroad who have never been domiciliated in this State, as well as those who, having once resided here, have since left the State.

The prescription of five years, established by art. 3505 of the Civil Code as to bills of exchange, applies to actions upon the instrument itself, for breaches of the contract of which it is the evidence.

*Quoad* creditors, the wife or her heirs must show, otherwise than by the confession or acknowledgment of the husband in the marriage contract, the origin and payment of the dowry. By the french law, the receipt of the husband to a person by whom the dowry was due, although by private act, provided its date be certain and anterior to suit by the creditors, is sufficient evidence of payment, subject to the right of the latter to controvert the receipt and prove its simulation; but the acknowledgment is not received as proof when the dowry purports to have been constituted by the wife herself, the legal presumption being that " *c'est donner à sa femme que de reconnaître en avoir recu quoique ce soit;*" in such a case the acknowledgment of the husband is not even binding on him or his heirs—the wife must prove the origin of the money, and the truth of the receipt. *Aliter*, as to the acknowledgment by the husband in the marriage contract of the estimated value of clothing, linen, and jewelry brought by the wife into the marriage, to an amount suitable to her condition; the presumption is that she had such things.

Where a father resides in this State, he will, though a foreigner, become of right the tutor of his children, on the death of their mother, and a legal mortgage will attach, in favor of his minor children, on real property owned by him here.

A foreigner residing in this State may be appointed a tutor by our courts.

It is the duty of a tutor, immediately after appointment, to reduce the property of his wards into possession, to render it productive, and to administer it as a prudent father of a family administers his own affairs.

In settling the accounts of a tutor he will not be allowed to make a donation to his wards, at the expense of his creditors.

<div align="right">SUCCESSION<br>OF<br>GUILLEMIN.</div>

APPEAL from the Second District Court of New Orleans, *Canon*, J. *St. Paul*, for *O. Guillemin*, appellant. *Pilié* and *Le Gardeur*, for *De la Paqueraie*, appellant. *Castera* and *Soulé*, for the appellees. The judgment of the court was pronounced by

ROST, J. This litigation arose upon the account rendered by the administrator of the succession of the late *I. F. A. Guillemin*, and has its origin in the following facts :

The marriage contract entered into in Paris, in the year 1812, between the deceased and *Caroline de Pierray*, his first wife, contains this clause :

" La future épouse apporte au dit mariage, et se constitue en dot tous les biens et droits à elle appartenant, consistant en une somme de 25,000 francs, argent comptant, et en ses habits, hardes, linge, et bijoux, de valeur de 5,000 francs, ainsi qu'elle en a justifié au futur époux, qui consent à demeurer chargé de tout envers elle, par le seul fait du mariage." The marriage took place at the date of the contract. In 1817, the deceased came to this place, with his wife and three children, who are the appellees in this suit. A few months after their arrival, *Caroline de Pierray* died, and, in 1821, the deceased married *Hortense Arnaud*, a native of Louisiana, who brought into marriage, as her dowry, two slaves, and various sums of money, amounting together to $6,856. In 1825, *Hortense Arnaud* died, leaving two children, the survivor of whom, *Onéida Guillemin*, in her own right, and as administratrix of the late *Hortense Guillemin*, her sister, is one of the appellants. In 1830, the deceased *Guillemin* was entrusted, at his own request, by *Martin de la Paqueraie*, who resides in Paris, with sums of money to be invested in Louisiana, and at his death, which occured in the city of Havana, in 1834, he was indebted to *De la Paqueraie*, on that account, in the sum of $10,407 41.

In 1835, *Julien Arnaud*, the maternal uncle of *Hortense* and *Onéida Guillemin*, was appointed their tutor, and no steps were taken for the settlement of the succession, till 1840, when the tutor caused himself to be appointed administrator. Several years after his appointment, the property of the succession was sold, and, in 1845, he rendered an account of his administration, showing a balance in his hands of $18,273 60, which he attempted to distribute as follows :

To the children by the second marriage, the amount of their mother's dowry, - - - - - - - - - - $9,136 80

To the same, for interest on said dowry, from the time of their mother's death, - - . - - - - - - 9,136 80

*De la Paqueraie* opposed the homologation of the account, and claimed the balance due him. The children of the first marriage also made opposition, alleging their right to be paid by preference 30,000 francs, the amount of their mother's dowry. The court below having dismissed the first opposition and sustained the last, *De la Paqueraie* and *Onéida Guillemin* appealed. The opi-

nion we have formed renders it necessary that the claim of *De la Paqueraie* be first noticed.

I. His claim is resisted on the ground of prescription, and it is alleged to be barred by lapse of time, under art. 3508 of the Code, which enacts that all personal actions are prescribed by ten years, if the creditor be present, or by twenty, if he be absent; and also under art. 3505, which provides that actions on bills of exchange and on all effects negotiable or transferable by endorsement or delivery, except bank-notes, are prescribed by five years, reckoning from the day when these engagements were payable. This claim originated in 1830, and the prescription of twenty years has not yet matured. It is contended that the prescription of ten years applies, because *De la Paqueraie* is not an absentee in the legal meaning of that word. That to be absent, one must have been present. The french authorities relied on in support of that position are not applicable to cases of prescription, even in France (Troplong, Prescription, no. 864); and if they were, we could not take them as our guides in opposition to an express provision of our Code not inconsistent with the other dispositions contained in that body of laws in relation to absentees. C. C. 3522. 14 La. 445. 15 La. 81. It cannot surely be said that *De la Paqueraie* was *present*; and, as under the article last cited all persons not present are absentees, his claim is not barred by the lapse of ten years.

It is now contended that the funds were transmitted to *Guillemin* by means of bills of exchange drawn by him on *De la Paqueraie*, with the previous authorisation of the latter; that he, *De la Paqueraie*, subjected himself thereby to the responsibility and rules relative to the instruments he adopted as a medium of transfer; and that, in as much as the gist of his action is the bills of exchange, his action must be barred by the prescription applicable to those instruments.

The argument of the counsel for *De la Paqueraie*, in opposition to this ground, has not been answered, and is unanswerable. Admitting *De la Paqueraie* to be subject to the rules applicable to bills of exchange, he could not, under those rules, have sued himself upon bills of which he was the acceptor, nor could he have brought suit on those bills against the drawer. He must have declared specially on the implied contract to indemnify, or for money paid to the drawer's use. The prescription of five years applies to actions upon the instrument itself, for breaches of contract. Here there was no breach of contract. The bills were duly honored and paid. The obligations which arose between the parties by reason of their payment are subject to the general rule for the prescription of personal actions. 3 Kent's Com. 86. Chitty on Bills. 334, 569, 648. Pardessus, Droit Commercial, vol. 2, pp. 184, 379, 402. Bailey on Bills, 343.

We have, therefore, come to the conclusion that the plea of prescription is not sustained by the authorities adduced in support of it; and, in ascertaining the rights of other parties, we will deem it our duty to give *De la Paqueraie* the benefit of all deductions which *Guillemin* himself, or the tutor of the children of the second marriage, might lawfully claim in a settlement with those children.

II. *De la Paqueraie* and *Onëida Guillemin* both contend that nothing is due to the children of the first marriage, because they have failed to show, by legal evidence, the *origin* and *numeration* of their mother's dowry. Under our jurisprudence it is well settled that, *quoad creditors*, the wife or her heirs must show, otherwise than by confession or acknowledgment of the husband, the

ɔrigin and payment of the dowry. Curia Filipica, 420, nos. 27, 38. Gomez  <span style="float:right">Succession</span>
ad leges Tauri, law 53, no. 52. 4 Febrero, part 1, book 3, § 1, no. 4; book 3,  <span style="float:right">OF<br>Guillemin.</span>
ch. 3, no. 136. 7 Mart. N· S. 460.*

In France, where the contract was made, Zachariæ lays down the rule on
the subject as follows: "La femme n'est en général admise à reclamer la res-
titution de sa dot, qu'à charge de prouver qu'elle a réellement apportée.  Cette
preuve doit se faire après les principes du droit commun." Vol. 3, p. 602, 3 º
He states, however, that the receipt of the husband to the person who owes
the dowry, although by private act, provided its date be certain and anterior to
the institution of the suit by the creditors, is sufficient evidence; reserving to
them the right to controvert the receipt and prove its simulation.  But under
the *principes du droit commun*, as settled by the jurisprudence of that country,
the acknowledgment of the husband is not received as proof when the dowry
purports to have been constituted by the wife herself, by reason of the legal
presumption prevailing there, as with us, *c'est donner à sa femme que de recon-
naître en avoir reçu quoique ce soit ;* and accordingly, the acknowledgment of the
husband that he has received from his wife a sum of money as her dowry, is
not of itself binding even upon him or his heirs; the wife must in all cases prove
the origin of the money and the truth of the receipt.  Cochin, tom 2, p. 580.
Coquille, question 120. Roussilhe, De la Dot, pp. 103, 104.

The law of France applicable to this controversy is believed not to differ from
that of Louisiana, and the children of the first marriage have complied with the
requisites of neither, in relation to the 25,000 francs, alleged to have been re-
ceived in money by their father.  The acknowledgments of the latter have not
even the force of receipts ; and we agree with the counsel for *De la Paqueraie*
that, if the claim of the deceased against the *Princess Poniatowski* has any thing
to do with the matters at issue, the evidence adduced in support of it raises a
strong presumption that the dowry of *Caroline de Pierray* was not paid.  Should
this outstanding claim be collected and its amount brought into court for dis-
tribution, a very different case would be presented.  But we are constrained
to say that, the appellees have failed to make out their rightt o receive the 25,000
francs mentioned in the marriage contract of their mother, out of the fund now
in the hands of of the administrator.  It is otherwise for the estimated value of
the *habits, hardes, linges, et bijoux*, brought by her into marriage.  The legal
presumption is, that she had those things to an amount suited to her condition ;
and the sum of 5,000 francs, at which they were appraised, is every way rea-
sonable.  It is not shown that at her death they were taken back by her heirs ;
the succession must, therefore, account for their estimated value.

By the death of *Caroline de Pierray*, *Guillemin* became of right the tutor of
his children.  The succession was opened, and the tutorship commenced, in
Louisiana.  During its continuance, and before his second marriage, *Guillemin*
acquired nearly all the property which he left at his death, and the circum-
stance of his not being a citizen of the country did not prevent a legal mortgage
from attaching upon it in favor of the minors.  The real property of the State
is undoubtedly, as a general rule, subject to its laws.  If the appellees were
deprived of the protection of those laws because their father was a foreigner,

---

* The counsel for the appellant *De la Paqueraie,* cited in support of this position, in
addition to the authorities in the text, 14 Toullier, no. 275.  2 Benoit, Traité de la Dot,
p. 233.  3 Zachariæ, p. 602.  *Lucket* v. *Lucket,* 11 La. 245.  *Fennessy* v. *Gonsoulin,*
Ib. 425.  *Dimitry* v. *Pollock,* 12 La. 296.  *Nores* v. *Carraby,* 5 Rob. 295.  *Dimitry*
v. *Pollock,* 5 Rob. 350.

[SUCCESSION OF GUILLEMIN.

it is not easily perceived how *Onëida Guillemin* could claim to be paid by preference to *De la Paqueraie*, as a mortgage creditor.

In support of the ground that the appellees had not a legal mortgage in Louisiana on the property of their tutor, the appellants have adduced the authority of Grenier, a french jurist, who lays down broadly the rule, that the law of France only speaks for french subjects, and not for foreigners. Troplong, another french commentator of high repute, denies this, and insists that the foreign minor, whether or not he resides in France, has a legal mortgage on the real property, which his tutor owns in that kingdom. Priv. et Hyp. vol. 1, p. 247. However this may be, our laws are not framed with reference to citizens alone. This country was the first to recognise the right of expatriation as an essential element of constitutional freedom, and has at all times discharged towards foreigners the obligations, imposed upon it by the recognition of that right, to give them, not merely an asylum, but a home. Before they are permitted to exercise political rights, a few years of probation are wisely required. But so far as civil rights are concerned, the citizen and the foreigner residing here, are believed to be *equal before the law*. Appointments of foreigners residing here as tutors are of daily occurrence, and their capacity has never been questioned.

The appellees are entitled to be paid, by preference, the sum of $952 38. They have set up no claim for interest; and we consider the earnest desire expressed by their counsel in argument that *De la Paqueraic* should be paid, as an honest and sufficient motive for having abstained from doing so.

The dowry of the second wife, exclusive of the two slaves which have returned to the possession of *Onëida Guillemin*, is admitted to be as stated in the marriage contract, $6,856. By a settlement made by *Guillemin* with the father of his wife, in January, 1823, the latter remained indebted to his son-in-law, on account of said dowry, in the sum of $4,091 20, on which he agreed to pay him interest at the rate of ten per cent per annum. The capital and interest were both paid in 1828; and the appellant *Onëida Guillemin* claims the sum of $1,392 06, being the portion of the interest which accrued after the death of her mother. It is in evidence that, from that time to that of the payment, she and her sister lived with their grandfather, and that no provision of any kind was made for them by their father. Under these facts we consider the appellant entitled to the interest she claims. Her father could not have compensated that interest against the subsequent expenses of the minors.

From the date of the settlement in 1828, to the death of *Guillemin*, in 1834, the two minors resided with him; and it is clearly shown that the income of their property was not sufficient to defray the expenses incurred for their maintenance and education. Whether or not their father intended to charge them for those expenses, to the full amount of their income, is immaterial. He had the right to do so, and *De la Paqueraie* must have the benefit of that right. Up to the death of their father, the appellees have no claim for interest. As soon as the tutor was appointed, it was his duty to reduce to possession the property of his wards, to render it productive, and to administer it as a prudent father of a family administers his own affairs. His failure to do so subjected him towards the minors to damages, at least equal to the interest of the amount due them. Ten years had elapsed since his appointment as tutor, when he filed the account of his administration. The property was sold for upwards of $22,000. It consisted of slaves, houses and lots. It apppears also that, at the death of .

*Guillemin*, he owned some stock, and one hundred thousand cigars are mentioned in the inventory. The administrator does not state whether the cigars ever came into his possession, and renders no account whatever of the rents and profits of the property since 1834. It appears that he has defrayed the expenses of his wards during that time, and although he does not so state it in his account, we must presume, in justice to him, that those assets, if received by him, have gone to pay those expenses; and that, if he did not receive them, and suffered the property to remain unproductive, he defrayed the minors' expenses by way of reparation for his negligence.

Had *Onëida Guillemin* made opposition and required the administrator to account for the missing assets, and for damages caused by his mal-administration, he would have had the right to compensate the expenses incurred by him on account of the minors against the share of the rents, profits and damages coming to them. Considering that the tutor cannot make a donation to his wards at the expense of an honest creditor, we will give effect to this compensation, for the benefit of *De la Paqueraie*. The interest on the sum due the minors would have been barely sufficient to pay their personal expenses; and, being of opinion that those expences must be held to have been paid by the succession, we are satisfied that *Onëida Guillemin* has no claim for interest since the death of her father.

We have not gone into the enquiry whether the new Code has made any change in the former laws requiring the tutor to pay interest on the sums that come to his hands from the day he receives them. Supposing the law to be unchanged, the appellant *Onëida Guillemin* has not shown herself entitled to receive interest since 1828.

For the reasons assigned, it is ordered that the judgment in this case be reversed. It is further ordered that the opposition of *Mrs. Andry*, *Mrs. Knight*, and *Auguste Guillemin* be sustained for the sum of $952 38, and that they be paid said sum by preference as creditors by the first mortgage. It is further ordered that *Onëida Guillemin*, in her name, and as administratrix of the succession of her sister *Hortense Guillemin*, be placed on the tableau for the sum of $8,248 06.

It is further ordered that *Martin de la Paqueraie*, be placed on the tableau for the sum of $10,407 41, to be paid as far as the assets will permit, after the other two claims, and all expenses in this suit and in the settlement of the succession generally, are satisfied. It is further ordered that the costs of the court below, and one-half of those of this appeal, be paid by the administrator; the other half of the costs of this appeal to be paid by the three appellees.